

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 2061 | **DATE** | 4/29/2003 |
| **CASE TITLE** | Gloria Nelson vs. Bertha McGee | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons stated in this opinion, this Court reverses the Bankruptcy Court's decision. It holds that McGee's entire debt to Nelson-Mitchell, the sum of $5,270.50, was not discharged as the result of McGee's discharge in bankruptcy and remains fully enforceable post-bankruptcy.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| ✓ | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |
| SN | courtroom deputy's initials |

number of notices

APR 3 0 2003 date docketed

docketing deputy initials

4/29/2003 date mailed notice

SN mailing deputy initials

Date/time received in central Clerk's Office

Document Number: 7

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**DOCKETED**
APR 3 0 2003

GLORIA NELSON, et al.,       )
                             )
            Plaintiff,       )
                             )
v.                           )    No.  03 C 2061
                             )    (Bankruptcy Court)
BERTHA McGEE,                )    (02 A 934)
                             )    (02 B 11163)
            Defendant.       )

## MEMORANDUM OPINION AND ORDER

Gloria Nelson and her mother Linda Mitchell (collectively "Nelson-Mitchell") appeal from the judgment of the Bankruptcy Court that rejected their adversary Complaint against debtor Bertha McGee ("McGee"). In that proceeding Nelson-Mitchell had sought to exclude, from McGee's discharge via her voluntary Chapter 7 bankruptcy petition, the pre-bankruptcy debt that McGee had owed to them. This appeal calls for the application of customary appellate standards of review, requiring examination of the Bankruptcy Court's factual findings for clear error and its conclusions of law de novo (see, e.g., In re UNR Indus., Inc., 986 F.2d 207, 208 (7th Cir. 1993)). This Court has done so, and that review clearly calls for reversal in favor of Nelson-Mitchell.

### Facts

Because there are really no facts in dispute, the issues posed by the current appeal can be resolved by a de novo legal analysis alone. What follows is a statement of the factual

background necessary for that purpose.

Nelson-Mitchell were McGee's tenants in Section 8 housing located at 8159 West Houston, Chicago, Illinois. They delivered a $2,500 security deposit to her in two cash installments. Initially McGee kept the deposit in a strongbox at her own residence, but when she later consulted with a lawyer about possibly evicting Nelson-Mitchell as tenants, he told her that she should have put the security deposit in an interest-bearing account--and she did so.

That was good advice. In the City of Chicago, all landlords' obligations with respect to all residential tenants' security deposits are exceedingly stringent, and they are spelled out in detail in Chicago Municipal Code §§5-12-080 to 5-12-082 (those sections are part of the Chicago Residential Landlord and Tenant Ordinance).[1] Although a photocopy of all of the cited sections is attached as Ex. 1 to this opinion, Code §080(a) is particularly worth quoting here:

> A landlord shall hold all security deposits received by him in a federally insured interest-bearing account in a bank, saving and loan association or other financial institution located in the State of Illinois. A security deposit and interest due thereon shall continue to be the property of the tenant making such deposit, shall not be commingled with the assets of the landlord, and shall not be subject to the claims of any creditor of the landlord or of the landlord's successors in interest, including a foreclosing

---

[1] Citations to those provisions will simply take the form "Code § --", omitting the "5-12" portion of the citation.

2

mortgagee or trustee in bankruptcy.

When in the latter part of 2000 Nelson-Mitchell decided not to renew their lease and to move out instead, McGee preempted that step by filing a forcible detainer action in the Circuit Court of Cook County, seeking to evict them and to collect what she claimed to be unpaid rent. Nelson-Mitchell moved out of the premises and asked McGee for the return of the security deposit. When she refused, Nelson-Mitchell filed not only an Answer but also a multi-count Counterclaim in the Circuit Court lawsuit, with Count IV seeking damages for McGee's failure to return the security deposit (Code §080(f) provides for damages of twice the amount of the deposit), and with Count V seeking the addition of interest (Code §080(f) also provides for the tenant's recovery of interest, while Code §081 specifies the interest rate for that purpose).

While the Circuit Court lawsuit was pending, McGee (who later testified before the Bankruptcy Court in this adversary proceeding that "I didn't think I was going to lose"[2]) somehow decided that the money had become hers to do with as she wished, so she took the money out of the bank account and put it to her own use in December 2001. At the very beginning of January 2002 Nelson-Mitchell filed a summary judgment motion in the Circuit

---

[2] McGee was just as unsound in her expectation then as she is in her legal position here.

3

Court, a motion that the state court judge decided in their favor in all respects in February 2002. Nelson-Mitchell were held to owe nothing whatever to McGee in rent, and judgment on the Counterclaim was entered in their favor and against McGee for $5,000 plus interest of $270.50.

McGee, by then having dissipated all of the funds, proceeded in March 2002 to file a voluntary petition under Chapter 7. That proceeding resulted in her discharge. And as stated earlier, Nelson-Mitchell's adversary Complaint, which sought to challenge the dischargeability of McGee's indebtedness arising out of what has been described here, was turned down by the Bankruptcy Court after an evidentiary hearing. This timely appeal followed.

### Dischargeability

One of the provisions of 11 U.S.C. §523 ("Section 523") that specify the exceptions to discharge in bankruptcy is at issue here. Here is Section 523(a)(4):

> A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--
>
> \* \* \*
>
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

Because no fraud or embezzlement or larceny on McGee's part has been charged by Nelson-Mitchell, the outcome-determinative issues on this appeal hinge on the meaning of "defalcation" and "fiduciary capacity."

4

Both of those concepts have been addressed by our Court of Appeals in <u>Meyer v. Rigdon</u>, 36 F.3d 1375 (7th Cir. 1994). As for "defalcation," the extended treatment in <u>Meyer</u>, <u>id</u>. at 1382-85 (drawing on the seminal opinion by Judge Learned Hand in <u>Central Hanover Bank & Trust Co. v. Herbst</u>, 93 F.2d 510, 511-12 (2d Cir. 1937)) concluded that the "mere negligent breach of a fiduciary duty is <u>not</u> a 'defalcation'" (<u>id</u>. at 1385 (emphasis in original)), but that some added element such as a "willful" or "reckless" failure on the debtor's part to come up with the money is necessary (<u>id</u>.). That poses no difficulty here: There can be no question that McGee's refusal to return her tenants' property, the security deposit, merited such a pejorative characterization.

As for the other necessary component of nondischargeability under Section 523(a)(4), <u>Meyer</u>, <u>id</u>. at 1382 confirms that "[t]he existence of a fiduciary relationship is a question of federal law."[3] On that score <u>In re Marchiando</u>, 13 F.3d 1111, 1115 (7th Cir. 1994)(most citations omitted) fleshes out the scope of the "fiduciary duty" concept:

> The high standard of loyalty and care that the law imposes on trustees is encapsulated in the term "fiduciary duty." Once it entered the law's bank of concepts, it became available for use in situations that, while not involving trusts in a formal sense,

---

[3] It should perhaps have been noted earlier that <u>Meyer</u> dealt with nondischargeability under Section 523(a)(11), rather than under 523(a)(4). But both subsections contain the same terms, and it follows of course that the terms are to be given identical meanings in the two places.

5

seemed to call for the imposition of the same high
standard. Restatement (Second) of Trusts §2, comment b
(1959). So a lawyer is deemed the fiduciary of his
client, even if he does not manage a fund entrusted to
him by the client, and a managing partner is a
fiduciary of the limited partners, corresponding to
shareholders of a corporation, although again there is
no trust in the conventional sense. Yet a further
extension of the fiduciary concept--the use of the
concept of "constructive trust" (where "construc-tive"
bears its usual legal meaning of "no") to impose the
fiduciary duty of a trustee on a person who is not a
trustee--has been held not to come within the reach of
section 523(a)(4). Davis v. Aetna Acceptance Co., 293
U.S. 328, 333, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934).
Resulting and implied trusts are out too. And a debtor
who has given his creditor a "trust receipt" to secure
the loan is not a fiduciary for purposes of the
statute.

Having thus explained the distinction between the presence and absence of fiduciary capacity, Marchiando, id. at 1115-16 goes on to identify the line of demarcation in this fashion:

The key to knitting the cases into a harmonious whole
is the distinction stressed in Davis and other cases
between a trust or other fiduciary relation that has an
existence independent of the debtor's wrong and a trust
or other fiduciary relation that has no existence
before the wrong is committed. A lawyer's fiduciary
duty to his client, or a director's duty to his
corporation's shareholders, pre-exists any breach of
that duty, while in the case of a constructive or
resulting trust there is no fiduciary duty until a
wrong is committed.

What the Bankruptcy Judge did in this instance--apart from focusing on whether the decision of another Bankruptcy Court in Massachusetts (in a case on which counsel for Nelson-Mitchell sought to rely) had or had not been impaired by some later decisions out of that same court, something that could of course

6

scarcely be considered as controlling in this case[4]--was to look at the lease between the parties and to say:

> I can't find any language in the form lease which indicates clearly there was any intent between the parties or among the parties of an intent to create a trust with regard to the security deposit.
>
> \* \* \*
>
> I find no intent to create a trust in the face of the document, nor any specifications of a trust purpose imposing fiduciary obligations on Ms. McGee under the terms of the lease and addendum.

But with all due respect, that gives the wrong answer because it asks the wrong question. What that approach ignores entirely is that the Chicago City Council has specifically decreed that the provisions of Code §§080 through 082 are an integral part of *every* lease that covers Chicago residential property of the type involved here, thus defining a vital aspect of the relationship between McGee as landlord and Nelson-Mitchell as tenants.[5] Here is the relevant portion of Code §010:

---

[4] Even though such bankruptcy court cases do not supply a definitive answer to the question posed here, In re Paeplow, 217 B.R. 705 (Bankr. D. Vt. 1998) provides a useful analysis. It rejected the existence of a fiduciary relationship where the creditor had pointed to a state statute as to security deposits--but it did so precisely because the statute called only for the return of the security deposit once the tenant had left the premises, lacking the detailed provisions requiring segregation of the funds and the prohibition against commingling that are the linchpin of Chicago's Code §080(a)--see 217 B.R. at 710.

[5] It is unnecessary to decide whether parties might have a right to contract out of those provisions so as to eliminate or modify a landlord's duties as to a security deposit, for nothing of that nature is involved here.

> This chapter applies to, regulates and determines
> rights, obligations and remedies under every rental
> agreement entered into or to be performed after the
> effective date of this chapter, for a dwelling unit
> located within the City of Chicago, regardless of where
> the agreement is made, subject only to the limitations
> contained in Section 5-12-020 [which limitations were
> not relevant or applicable to the lease here]. This
> chapter applies specifically to rental agreements for
> dwelling units operated under subsidy programs of
> agencies of the United States and/or the State of
> Illinois, including specifically, programs operated or
> subsidized by the Chicago Housing Authority and/or the
> Illinois Housing Development Authority to the extent
> that this chapter is not in direct conflict with
> statutory or regulatory provisions governing such
> programs.

All of that being so, it is frankly difficult to imagine a more express statement of a fiduciary duty running from McGee to Nelson-Mitchell than that embodied in their landlord-tenant relationship under Code §080(a) and its related provisions--a duty that really qualifies as an express trust created by the parties' entry into their rental agreement that by definition includes that duty (or even if not, a duty that imposes the same "high standard of loyalty and care" (Marchiando, 13 F.3d at 1115)). It is a duty whose existence antedated and was independent of McGee's later wrong (id.), and McGee breached that duty both willfully and recklessly (to return to the concept of "defalcation").

It follows without question that the decision of the Bankruptcy Court must be reversed. McGee's discharge in bankruptcy does not encompass her debt to Nelson-Mitchell, which

8

remains an outstanding and enforceable obligation.

Because the Bankruptcy Court reached the opposite conclusion, it had no occasion to consider the proper measure of the indebtedness if, as this Court has decided, it is nondischargeable. As stated earlier, the Circuit Court's judgment in conformity with the provisions of the Code--and hence the amount of McGee's pre-bankruptcy indebtedness to Nelson-Mitchell--was for *twice* the amount of the security deposit itself ($5,000 rather than $2,500) as well as for interest on that sum.

Just last month the United States Supreme Court, in *Archer v. Warner*, 71 U.S.L.W. 4249 (U.S. 2003), held that a debt embodied in a settlement agreement, which had resolved an earlier claim that money had been obtained by fraud, continued to retain the same fraud-tainted character so as to be nondischargeable in bankruptcy. That is essentially a reconfirmation of the principle announced in the unanimous opinion in *Cohen v. de la Cruz*, 523 U.S. 213 (1998). *Cohen* held that the Section 523(a) exceptions from discharge, when they speak of "debt for" a particular type of liability, "connot[e] broadly any liability arising from the specified object" (*id*. at 220). And just as that led to the conclusion that a state court judgment that trebled the fraudulent amount at issue in *Cohen* provided the measure of nondischargeability there, by parity of reasoning McGee's nondischargeable debt is the full amount of the Circuit

Court judgment: $5,270.50.

## Conclusion

For the reasons stated in this opinion, this Court reverses the Bankruptcy Court's decision. It holds that McGee's entire debt to Nelson-Mitchell, the sum of $5,270.50, was not discharged as the result of McGee's discharge in bankruptcy and remains fully enforceable post-bankruptcy.

_____
Milton I. Shadur
Senior United States District Judge

Date: April 29, 2003

~~The landlord may enter only at reasonable times except in case of an emergency. An~~ entry between 8:00 A.M. and 8:00 P.M. or at any other time expressly requested by the tenant **shall** be presumed reasonable. (Prior code § 193.1-5; Added. Council Journal of Proceedings, September 8, 1986, page 3377 1)

**5-12-060 Remedies For Improper Denial Of Access.**

If the tenant refuses to allow lawful access, the landlord may obtain injunctive relief to compel access or terminate the rental agreement pursuant to Section 5-12-130(b) of this chapter. In either case, the landlord may recover damages.

If the landlord makes an unlawful entry or a lawful entry in an unreasonable manner or makes repeated unreasonable demands for entry otherwise lawful, but which have the effect of harassing the tenant, the tenant may obtain injunctive relief to prevent the recurrence of the conduct, or terminate the rental agreement pursuant to the notice provisions of Section **5-12- 110(a)**. In each case, the tenant may recover an amount equal to not more than one month's rent or twice the damage sustained by him, whichever is greater. (prior code § 193.1-6; Added. Council Journal of Proceedings, September 8, 1986, page 3377 1; Amend. Council Journal of Proceedings, November 6, 1991, page 7202)

**5-12-070 Landlord's Responsibility To Maintain.**

The landlord **shall** maintain the premises in compliance with all applicable provisions of the municipal code and shall promptly make any and all repairs necessary to fulfill this obligation. (Prior code **§193.1-7;** Added. Council Journal of Proceedings, September 8, 1986, page 3377 1)

**5-12-080 Security Deposits.**

(a) A landlord shall hold **all** security deposits received by him in a federally insured interest-bearing account in a bank, savings and loan association or other financial institution located in the State of Illinois. A security deposit and interest due thereon shall continue to be the property of the tenant making such deposit, shall not be commingled with the assets of the landlord, and shall not be subject to the claims of any creditor of the landlord or of the landlord's successors in interest, including a foreclosing mortgagee or trustee in bankruptcy.

(b) Any landlord or landlord's agent who receives a **security** deposit from a tenant or prospective tenant **shall** give said tenant or prospective tenant at the time of receiving such security deposit a receipt indicating the amount of such security deposit, the name of the person receiving it and, in the case of the agent, the name of the landlord

*Exhibit 1 - Boldface matters are in the pamphlet available for public distribution, not in the ordinance itself*

for whom such security deposit is received, the date on which it is received, and a description of the **dwelling** unit. The receipt shall be signed by the person receiving the security deposit. Failure to comply with this subsection shall **entitle** the tenant to immediate return of security deposit.

(c) A landlord who holds a security deposit or prepaid rent pursuant to this section for more than six months, after the effective date of this chapter **shall** pay interest to the tenant accruing from the beginning date of the rental term specified in the rental agreement at the rate, determined in accordance with Section 5- 12-08 1. The landlord shall, within 30 days after the end of each **12-month** rental period, pay to the tenant any interest, by cash or credit to be applied to the rent due. (Amend. Council Journal of Proceedings; November 6, 199 1, page 7203; Added. Council Journal of proceedings, May 14, 1997, page 4516)

(d) The landlord **shall**, within 45 days after the date that the tenant vacates the **dwelling** unit or within 7 days after the date that the tenant provides notice of termination of the rental agreement pursuant to Section 5- 12- 110(g), return to the tenant the security deposit or any balance thereof and the required interest thereon; provided, however, that the landlord may deduct from such security deposit or interest due thereon for the following:

(1) any unpaid rent which has not been validly withheld or deducted pursuant to state or federal law or local ordinance; and

(2) a reasonable amount necessary to repair any damage caused to the premises by the tenant or any person under the tenant's control or on the premises with the tenant's consent, reasonable wear and tear excluded. In case of such damage, the landlord **shall** deliver or mail to the last known address of the tenant within 30 days an itemized statement of the damages **allegedly** caused to the premises and the estimated or actual cost for repairing or replacing each item on that statement, attaching copies of the paid receipts for the repair or replacement. If estimated cost is given, the landlord shall furnish the tenant with copies of paid receipts or a certification of actual costs of repairs of damage if the work was performed by the landlord's employees within 30 days from the date the statement showing estimated cost was furnished to the tenant.

(e) In the event of a sale, lease, transfer or other direct or indirect disposition of residential real property, other than to the holder of a lien interest in such property, a landlord who has received a security deposit or prepaid rent from a tenant, the successor landlord of such property **shall** be liable to that tenant for any security deposit, including statutory interest, or prepaid rent which the tenant has paid to the transferor.

The successor landlord shall, within 10 days from the date of such transfer, notify the tenant who made such security deposit by delivering or mailing to the tenant's last known address that such security deposit was transferred to the successor landlord and that the successor landlord is holding said security deposit. Such notice shall also contain the successor landlord's name, business address, and business telephone number of the successor landlord's agent, if any. The notice shall be in writing.

The transferor shall remain jointly and severally liable with the successor landlord to the tenant for such security deposit or prepaid rent, unless and until such transferor transfers said security deposit or prepaid rent to the successor landlord and provides notice, in writing, to the tenant of such transfer of said security deposit or prepaid rent, specifying the name, business address and business telephone number of the successor landlord or his agent within 10 days of said transfer.

(f) If the landlord or landlord's agent fails to comply with any provision of Section 5-12-080 (a) — (e), the tenant shall be awarded damages in an amount equal to two times the security deposit plus interest at a rate determined in accordance with Section 5-12-081. This subsection does not preclude the tenant from recovering other damages to which he may be entitled under this chapter. (Prior code § 193.1-8; Added. Council Journal of Proceedings, September 8, 1986, page 33771; Amend. Council Journal of Proceedings, November 6, 1991, page 7204; Added. Council Journal of Proceedings, May 14, 1997, page 45168)

5-12-081 Interest Rate On Security Deposits.

During June of 1997 and thereafter during December of each year, the city comptroller shall review the status of banks within the city and interest rates on passbook savings accounts, insured money market accounts and six-month certificates of deposit at commercial banks located within the city. On the first business day of July of 1997, and thereafter on the first business day of each year, the city comptroller shall announce the rates of interest, as of the last business day of the prior month, on passbook savings accounts, insured money market accounts and six-month certificates of deposit at the commercial bank having its main branch located in the city and having the largest total asset value. The rates for money market accounts shall be based on the minimum deposits for such investments. The rates for certificates of deposit shall be based on a deposit of $1,000. The city comptroller shall calculate and announce the average of the three rates. The average of these rates so announced by the city comptroller shall be the rate of interest on security deposits under rental agreements governed by this chapter and made or renewed after the most recent announcement.* (Added. Council Journal of Proceedings, May 14, 1997, page 45168)

---

* Current rate — January 1, 1999 through December 31, 1999: 2.63%

5- 12-082 Interest Rate Notification.

The city **comptroller**, after computing the rate of interest on security deposit governed by this chapter, shall cause the new rate of security deposit interest to be published for five consecutive business days in two or more newspapers of general circulation in the city. The mayor shall direct the appropriate city department to prepare and publish for free public distribution at government offices, libraries, schools and community organizations, a pamphlet or brochure describing the respective rights, obligations and remedies of landlords and tenants with respect to security deposits, including the new interest rate as well as the interest rate for each of the prior two years. The commissioner shall also distribute the new rate of security deposit interest, as well as the interest rate for each of the prior two years, through public service announcements to all radio and television outlets broadcasting in the city. (Added. Council Journal of Proceedings, May 7, 1997, page 45169)

5-12-090 Identification Of Owner And Agents.

A landlord or any person authorized to enter into an oral or written rental agreement on the landlord's behalf shall disclose to the tenant in writing at or before the commencement of the tenancy the name, address, and telephone number of:

(a) the owner or person authorized to manage the premises; and

(b) a person authorized to act for and on behalf of the owner for the purpose of service of process and for the purpose of receiving and receipting for notices and demands.

A person who enters into a rental agreement and fails to comply with the requirements of this section becomes an agent of the landlord for the purpose of (i) service of process and receiving and receipting for notices and demands and (ii) performing the obligations of the landlord under this chapter under the rental agreement.

The information required to be furnished by this section shall be kept current and this section extends to and is enforceable against any successor landlord, owner or manager.

If the landlord fails to comply with this section, the tenant may terminate the rental agreement pursuant to the notice provisions of Section 5- 12- 110(a). If the landlord fails to comply with the requirements of this section after receipt of written notice pursuant to Section 5-12-110(e), the tenant shall recover one month's rent or actual damages,